# In the United States Court of Federal Claims

No. 10-754C
(Originally Filed: April 30, 2012)
(Reissued: May 21, 2012)[1]

* * * * * * * * * * * * * * * * * * * *

MARK ROBERTS,

      *Plaintiff*,

v.

THE UNITED STATES,

      *Defendant*.

Living Quarters Allowance; 5 U.S.C. § 5923; Department of State Standardized Regulations; *Trifunovich v. United States*; money-mandating statute

* * * * * * * * * * * * * * * * * * * *

*Brandon O. Moulard*, Atlanta, GA, for plaintiff.

*Kathryn Elizabeth Witwer*, United States Department of Justice, with whom were *Steven J. Gillingham*, Assistant Director, *Jeanne E. Davidson*, Director, and *Tony West*, Assistant Attorney General.

_____

OPINION

_____

BRUGGINK, *Judge*.

This is an action by a civilian Marine Corps employee seeking the payment of a living quarters allowance ("LQA") as provided by 5 U.S.C. § 5923 (2006). Although the Marine Corps neither offered nor advertised the payment of LQA for this particular job posting, plaintiff contends that he is owed the allowance as a matter of law. Currently before the court are

---

[1] This opinion was originally issued under seal in order for the parties to propose redactions. The parties did not propose any redactions. The opinion appears in full below.

defendant's motion for summary judgment and partial dismissal and motion *in limine* to strike certain declarations. The motions are fully briefed, and we heard oral argument on March 7, 2012. For the reasons explained below, we grant defendant's motion for summary judgment, rendering the motion *in limine* moot.

## BACKGROUND[2]

Plaintiff, Mr. Mark Roberts, is an American citizen living in Okinawa, Japan. He retired from the Marine Corps in 2008 after twenty-seven years of service. In April 2008, the Marine Corps posted job announcement number OK-08-058. It listed a job vacancy entitled "Deputy Camp Commander for Camp Operations" at Camp Hansen, a part of Camp Butler, a Marine base in Okinawa. The Deputy Camp Commander ("DCC") would serve as an advisor to the camp commander and would also be responsible for overseeing day-to-day operations at Camp Hansen.

Prior to this job announcement, deputy camp commander positions were normally filled by active-duty marines. Due to frequent deployments, however, the DCC posts were often vacant or experienced high turnover. To minimize the effects of deployment on day-to-day camp operations, the commanding general of Camp Butler sought to transform these into civilian positions.

The vacancy announcement noted a salary of $57,146 to $110,691 per year and, importantly to this case, that: "This position does not incur overseas allowances. Payment of travel and transportation expenses is not authorized. However, anyone on a transportation agreement with LQA [living quarters allowance] may be granted continuance." Def.'s App. 203. LQA is a quarters allowance given to civilian employees for the annual cost of suitable housing for the employee and his or her family. Plaintiff had not been in a civilian position before, and thus did not qualify for a continuance of LQA.

Commanding General Krusa-Dossin, who earlier in her career had served in a DCC capacity, decided not to offer LQA for the DCC positions for

---

[2] The following facts are drawn from the defendant's motion for summary judgment and attachments thereto; unless otherwise indicated, they are not in dispute.

two reasons. As she explains in her affidavit, in her experience (thirty-five years of active service), LQA would not be needed for a recruitment tool, as Okinawa was home to many service members ending their service commitment and desiring to stay in Japan. Additionally, there was a lack of funding and paying LQA would require shifting funds from other important command programs. Because the commanding general was already shifting funds from other programs to pay the new civilian salaries for the DCCs, she believed she could not stretch the operating budget any further. As commanding general, she had final approval authority for all budgetary matters.

The area of candidate consideration for the vacancy was "Okinawa-wide," meaning that the Marine base was seeking persons already located in Okinawa. Fourteen qualified local candidates, including plaintiff, applied for the job. The local human resource office completed a "Certificate of Eligibles," listing the qualified applicants and noting those who were interviewed. The Certificate of Eligibles then ranked the top three candidates. Plaintiff was ranked first and, on May 28, 2008, Mr. Mark Singerhouse, a human resource specialist for the Marine Corps, contacted plaintiff by telephone and extended the job offer. Mr. Singerhouse informed plaintiff of the annual salary and noted that LQA was not offered. Mr. Roberts accepted the position.

After accepting the job, plaintiff submitted a request to the Marine Corps for a "continuation of his LQA." The Corps denied the request in a formal written determination. *See* Def.'s App. 224-26. The determination letter noted that plaintiff's appointment to the DCC position was his first civilian appointment in federal service. Thus, plaintiff was in fact seeking a continuation of his military overseas housing allowance and not LQA. Plaintiff does not contest that, under applicable federal regulations, the military overseas allowance does not apply to plaintiff's post-retirement civilian employment. The determination letter further noted that plaintiff did not, in any event, qualify for LQA because, as evidenced by the Certificate of Eligibles, there were locally qualified applicants available for the DCC position.

Plaintiff filed a complaint with the Office of Personnel Management ("OPM") seeking reconsideration of the denial of his LQA request. OPM denied reconsideration, explaining that the vacancy announcement stated that "[t]he position does not incur overseas allowances," Def.'s App. 230, and that, when the job was offered to plaintiff, "it was made clear that the salary would

be $57,146 with no LQA." *Id.* Additionally, OPM concluded that although plaintiff may theoretically have been eligible for LQA under the general Department of State regulations, it noted that "the [Department of State regulations] only establish[] basic LQA eligibility parameters but allow[] the using agencies latitude to decide in what circumstances they will actually grant LQA to eligible individuals." *Id.* at 233. OPM therefore denied plaintiff's request for LQA.

On November 2, 2010, plaintiff filed his complaint here alleging that defendant wrongfully denied his LQA request, and that he is automatically entitled to LQA under applicable statutes and regulations. Defendant initially moved to dismiss based on lack of jurisdiction, asserting that the statute allowing LQA, 5 U.S.C. § 5923, *per se* was not money-mandating. Citing to *Trifunovich v. United States*, 196 Ct. Cl. 301 (1971), we rejected that theory, and held that 5 U.S.C. § 5923 mandates the payment of money if the prerequisites for payment and eligibility are met. *Roberts v. United States*, No. 10-754 (Fed. Cl. Jun. 29, 2011) (order denying motion to dismiss). Thus, because there are instances in which a plaintiff can rely on 5 U.S.C. § 5923, dismissal for lack of subject matter jurisdiction would have been improper. Now that we are presented with defendant's motion for summary judgment, however, and proceed to examine the undisputed material facts, it is apparent that the prerequisites for payment and eligibility were not satisfied. Consequently, we grant defendant's motion for summary judgment.

DISCUSSION

The gravamen of plaintiff's argument is that 5 U.S.C. § 5923 and the Department of State Standardized Regulations ("DSSR") entitle him to LQA as a matter of law. Plaintiff relies on *Trifunovich* for the proposition that, once the requirements in 5 U.S.C. § 5923 and the DSSR are met, the government must pay LQA irrespective of whether the agency has opted not to offer LQA for the position. Defendant responds that the implementing regulations give the local base commander discretion not to offer LQA and that the base commander here made that election with respect to the DCC position.

A.   Delegation of LQA-granting authority

The Overseas Differentials and Allowance Act (the "Act"), Pub. L. 86-707, 74 Stat. 792 (codified at 5 U.S.C. §§ 5921–24 (2006)), established a government-wide framework for paying certain types of allowances, such as

cost-of-living adjustments, for government employees living abroad. Thus, when government-owned quarters are not available for an employee in a foreign area, a living quarters allowance can be awarded under 5 U.S.C. § 5923(a)(2).

LQA provided by 5 U.S.C. § 5923 is further governed by the provisions contained in 5 U.S.C. § 5922, which provides that the employee must be a United States citizen whose salary is set by administrative action. Subsection (c) of section 5922 further provides that "[t]he allowances and differentials authorized by this subchapter shall be paid under regulations prescribed by the President." President Eisenhower, in Executive Order 10903, delegated to the Secretary of State the authority to "prescribe regulations . . . [governing] the payment of allowances and differentials authorized by [the Overseas Differentials and Allowance Act]." Exec. Order No. 10903, at I.b, 26 F.R. 217, 1961 WL 8156.

Using that delegation of authority, the Secretary of State adopted regulations relating to LQA in the DSSR. DSSR § 031.12 establishes general LQA criteria for those employees, such as plaintiff, recruited outside of the United States. Those requirements are:

    a.    the employee's actual place of residence in the place to which the quarters allowance applies at the time of receipt thereof shall be fairly attributable to his/her employment by the United States Government; and

    b.    prior to appointment, the employee was recruited in the United States, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, the former Canal Zone, or a possession of the United States, by:

        (1) the United States Government, including its Armed Forces;

        (2) a United States firm, organization, or interest;

        (3) an international organization in which the United States Government participates; or

>   (4) a foreign government
>
>   and had been in substantially continuous employment by such employer under conditions which provided for his/her return transportation to the United States, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, the former Canal Zone, or a possession of the United States; or
>
> c.  as a condition of employment by a Government agency, the employee was required by that agency to move to another area, in cases specifically authorized by the head of agency.

DSSR § 031.12. Plaintiff argues that he meets the above criteria,[3] automatically entitling him to LQA, despite the fact that the appointing authority elected to make the position ineligible for LQA.

What plaintiff ignores is that the DSSR further delegates the authority to write additional LQA-eligibility regulations. DSSR § 013 provides that when the "head of an agency" is allowed under law to defray certain expenses, including quarters allowances, the agency head may "issue such further implementing regulations as he/she may deem necessary for the guidance of his/her agency with regard to the granting of and accounting for these payments." DSSR § 013. Thus, the DSSR expressly delegates authority to the heads of other federal agencies, in this case, the Secretary of Defense, to implement additional LQA regulations.

Using that delegation, the Secretary of Defense issued Department of Defense Instruction number 1400.25, volume 1250 (the "Instruction") further

---

[3] Although not the focus of the briefing, at OPM, plaintiff argued that Section 9 of the Status of Forces Agreement with Japan and that section 705 of the Servicemembers Civil Relief Act, Pub. L. No. 108-189, 117 Stat. 2835 (2003), render him eligible as a United States-based hire for LQA purposes. Because we hold as a matter of law that the Marine Corps was under no legal obligation to offer LQA for the DCC position, and because it opted not to do so, we need not consider whether plaintiff would have satisfied the requirements under the DSSR, assuming the position was LQA-eligible.

6

delegating to the heads of the Department of Defense components (e.g., Department of the Navy), the ability to grant and regulate the allowances provided by the DSSR, and more specifically, overseas allowances and differentials.

The Instruction notes that "overseas allowances and differentials are not automatic salary supplements, nor are they entitlements." Instruction § 4(c). Moreover, "Individuals shall not automatically be granted these benefits simply because they meet eligibility requirements." *Id.* Instead, the Instruction requires that the "[i]ndividuals authorized to grant overseas allowances and differentials shall consider the recruitment need, along with the expense the activity or employing agency will incur, prior to approval." *Id.* § 4(d).

LQA-granting authority has been further delegated within the Department of Defense to individual branches of the armed forces, such as the Marine Corps. *See* Secretary of the Navy Instruction 12250.6 (Jan. 22, 2003) (delegating civilian human resources management throughout the Navy). Marine Corps Bases Japan ("MCBJ"), the Japanese-wide segment of the Marine Corps, and a subdivision of the Department of Defense and Department of the Navy, has established rules governing LQA and implementing Navy and Department of Defense human resources policies. On October 10, 2007, MCBJ issued Order P12000.2A (the "Order"), defining the eligibility of civilian employees for LQA.

Order P12000.2A largely mirrored the previous authorities insofar as it noted that: "LQA is not an entitlement or automatic salary supplement and is normally deemed an unnecessary inducement for persons already living in the foreign area." Def.'s App. 222. Under the "Command Responsibilities" section, it noted that: "LQA is not authorized when there are qualified locally available candidates for hire, except when the selectee is currently receiving LQA from MCBJ, or another DoD agency on Okinawa." *Id.* The order further provided that, "[i]n determining whether or not to grant LQA, the recruitment need, along with the expense the activity or MCBJ will incur, shall be considered." *Id.* at 223. Moreover, "Individuals shall not automatically be granted LQA simply because they meet eligibility requirements." *Id.* Both the Instruction and the Order thus direct the appointing official to make a determination of whether to offer LQA for a particular vacancy.

Under the regulatory scheme, therefore, while an individual would have to meet the DSSR requirements, the agency must first designate the position as eligible for LQA. The language of both the Instruction and Order contemplates that some vacancies will never be designated for LQA, even though the successful applicant otherwise meets the basic DSSR requirements.

The DCC position was expressly designated non-LQA eligible. Contrary to plaintiff's argument, therefore, unless the Instruction and Marine Corps Order P12000.2A are invalid, the commanding general had the discretion to make the position non-LQA eligible. Plaintiff's principal argument therefore is that the delegation of such authority to the Marine Corps and the local base commander was invalid.

There are two relevant ways in which a regulation can be invalid: (1) there has not been a proper delegation of rule-making authority, or (2) the regulation exceeds the statutory grant of authority. *See, e.g., Killip v. Office of Personnel Mgmt.*, 991 F.2d 1564, 1569 (Fed. Cir. 1993). Regulations "carry . . . a strong presumption of validity," *Farrel-Birmingham Co. v. United States*, 129 Ct. Cl. 332, 342 (1954), however, and are sustained unless "plainly inconsistent with the statute," *Melamine Chems., Inc. v. United States*, 732 F.2d 924, 928 (Fed. Cir. 1984). Plaintiff has made no real effort to sustain his burden of justifying the invalidation of the regulations.

Nothing in Congress's grant of rule-making authority to the President prevents his delegation of authority to the Secretary of State and the Secretary of Defense. Such delegations, and indeed, further sub-delegations are routine. An agency may delegate to its own subdivisions, *Ind. Bell Tel. Co., Inc. v. McCarty*, 362 F.3d 378, 387 (7th Cir. 2004), and even to other agencies altogether, *see United States v. Burnes*, 816 F.2d 1354, 1360 (9th Cir. 1987).

Nor do the Instruction and Order exceed the grant of statutory authority. Section 5923 provides that quarter allowances may be granted when government owned or rented facilities are not available, and section 5922(c) provides that such allowances "shall be paid under regulations prescribed the President." Agencies are granted broad discretion in implementing the language of a statute. *See United States v. Mead Corp.*, 533 U.S. 218, 227 (2001); *Smiley v. Citibank*, 517 U.S. 735, 740 (1996); *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 69 F.3d 1340, 1345 (Fed. Cir. 2012); *Schism v. United States*, 316 F.3d 1259, 1305 (Fed. Cir. 2002). Nothing in the text of the statute here is inconsistent with the grant of authority

by the Department of Defense and Marine Corps to the appointing authority to determine whether LQA will be offered for a particular vacancy.

Plaintiff's real argument is that this result is inconsistent with *Trifunovich*. According to plaintiff, the holding of *Trifunovich* is that an individual is entitled to LQA so long as he or she meets the elements set out in § 5923 and the DSSR, irrespective of the Instruction and Order. We disagree. *Trifunovich* and other similar cases make no reference to the Instruction and service branch orders; presumably, because these regulations were adopted after those cases were decided.[4] Under the regulations as they stood at that time, the only question was whether plaintiff personally qualified for LQA.

In *Trifunovich*, plaintiff was a Navy civilian employee seeking LQA during a posting in London. 196 Ct. Cl. at 313. The Navy denied the claim. At that time, the DSSR required that an employee recruited outside the United States must have been "temporarily in the foreign area for travel or formal study and immediately prior to such travel or study had resided in the United States." *Id.* at 314 (quoting 1961 DSSR). For the 18-month period before his appointment, plaintiff had not resided in the United States, but rather lived at several locations in Europe. The Navy took the position that he was therefore not temporarily in the foreign area for travel or study at the time of his appointment, and thus did not meet all the requirements of the DSSR. The Court of Claims, however, held that the plaintiff was, in fact, temporarily in the foreign area at the time of his appointment. *Id.* at 333.

The Navy argued alternatively that the language of § 5923 ("quarters allowances may be granted") is permissive in nature, and the Navy was thus entitled to withhold payment of LQA even if plaintiff met the requirements. The Court of Claims disagreed: "but for its erroneous decisions [relating to plaintiff's temporary status], the Navy admittedly would have paid him a living quarters allowance." *Id.* at 311. Plaintiff's right to recovery, therefore, "flow[ed] not from a showing of any abuse of discretion, arbitrariness or

---

[4] *Tyler v. United States*, 220 Ct. Cl. 387 (1979); *Brown v. United States*, 217 Ct. Cl. 710 (1978); *Boston v. United States*, 43 Fed. Cl. 220 (1999); *Zervas v. United States*, 28 Fed. Cl. 66 (1993). It is unclear from the record whether any regulations in existence before the relevant time period here, 2008, granted similar discretion. It is clear from those cases, however, that such delegations of authority were not argued by the government.

capriciousness, but from proof of deprivation of statutory and regulatory rights on an invalid basis." *Id*. The statute and DSSR thus mandated the payment of LQA.

Here, the Marine Corps, exercising authority granted by the Instruction and Order, elected from the outset not to pay LQA, regardless of the status or circumstances of the employee hired. Assuming the regulations are valid, therefore, they do not "mandate" the payment of money to plaintiff.

Plaintiff cites to *Adde v. United States*, 81 Fed. Cl. 415 (2008), and *Thomas v. United States*, No. 10-303 (Fed. Cl. Sept. 7, 2011), to support his view of the holding in *Trifunovich*. In *Adde*, an employee of the National Institute of Health ("NIH"), working overseas for an international health organization, brought suit to recover foreign post allowances as provided in § 5924 and DSSR § 220. 81 Fed. Cl. at 416-17. Citing to *Trifunovich*, *Adde* held that § 5924 is "money-mandating," and payment is thus mandatory if "she [met] the requirements." *Id.* at 419. Because *Adde* was a jurisdictional challenge, however, the court did not address any agency-specific regulations or even Adde's particular factual circumstances. *Adde* is thus not inconsistent with our decision here.

In *Thomas*, Judge Baskir held that a construction representative hired by the United States Army Corps of Engineers in Europe was entitled to LQA because he met the requirements of the DSSR. *Thomas*, No. 10-303, slip. op. at 1. The Army Corps had a "Living Quarters Policy" memorandum, which stated, "LQA is not an automatic salary supplement or entitlement. . . . When an individual is already residing in a foreign area, LQA as a recruitment incentive is not normally required." *Id.* at 3. Army-wide regulations were also in place providing additional LQA-eligibility requirements. The *Thomas* court held that the Army's regulatory scheme contravened the DSSR because it gave "the agency discretion to disallow a living quarters allowance when the DSSR provisions would otherwise mandate the allowance," and it thus "disregarded the other regulations and guidances implemented pursuant to the DSSR insofar as they conflict with the DSSR." *Id.* at 7.

We respectfully disagree with the analysis in *Thomas*. The DSSR expressly contemplates that the "head of an agency" may issue further implementing regulations "as he/she may deem necessary . . . with regard to the granting" of overseas allowances, including LQA. DSSR § 013. The

10

Marines Corps was thus authorized by the Instruction to determine whether the DCC vacancies would be eligible for LQA.

B.   The decision not to grant LQA is an internal human resources decision that is not reviewable in this court

While plaintiff's principal argument is that the Marine Corps did not have the discretion to make the DCC vacancies ineligible for LQA, he also implicitly challenges the merits of that decision. Specifically, he questions whether General Krusa-Dossin abused her discretion when she concluded that there would be a sufficient pool of local applicants to obviate the need for LQA, and that the Corps did not have sufficient financial resources to pay LQA and to meet other budget needs to which she assigned higher priority. In support of this line of argument, plaintiff offers declarations of two Marine officers who question her decision. The government has moved to strike the affidavits for lack of first-hand knowledge. It argues in the alternative that the decision of whether to grant LQA for a particular vacancy is essentially a non-justiciable issue. We agree with the latter argument, making the first moot.

Federal agencies "have discretion in determining most matters relating to the terms and conditions of federal employment." *United States v. Testan*, 424 U.S. 392, 394 (1976). Even more acutely in military cases, "[s]trong policies compel the court to allow the widest possible latitude to the armed services in their administration of personnel matters." *Sanders v. United States*, 594 F.2d 804, 813 (Ct. Cl. 1979). Plaintiff would have the court interject itself into the internal human resources decision-making of military officers, precisely the type of issue the Federal Circuit in *Voge v. United*

11

*States*, 844 F.2d 776, 780 (Fed. Cir. 1988), instructed was non-justiciable.[5] We thus decline to assess the merits of General Krusa-Dossin's determination.[6]

## CONCLUSION

For the reasons explained above, we grant defendant's motion for summary judgment. The clerk shall enter final judgment in favor of defendant and dismiss the complaint. No costs.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Judge

---

[5] Although not argued by plaintiff here, the extent of our potential involvement might be the determination of whether the agency complied with the procedures set out in the Instruction and Order. *See Murphy v. United States*, 993 F.2d 871, 873 (Fed. Cir. 1993). The limit of such review would be whether the commanding general considered the two applicable factors of budget constraint and recruitment need. Plaintiff here does not question the fact that this calculus was performed. Instead, he seeks the court's review of the merits of General Krusa-Dossin's determination.

[6] Plaintiff also advanced a theory of promissory estoppel–a type of claim over which we have no jurisdiction. *Carter v. United States*, 98 Fed. Cl. 632, 638 (2011).